1 | JENNIFER L. LIU – 279370
**THE LIU LAW FIRM, P.C.**
1170 Market Street, Suite 700
San Francisco, California 94102
Telephone:    (415) 896-4260
Facsimile:    (415) 231-0011
Email:        jliu@liulawpc.com

JENNIFER A. REISCH – 223671
REBECCA PETERSON-FISHER – 255359
**EQUAL RIGHTS ADVOCATES**
1170 Market Street, Suite 700
San Francisco, CA 94102
Telephone:    (415) 621-0672
Facsimile:    (415) 631-6744
Emails:       jreisch@equalrights.org, rpetersonfisher@equalrights.org

JOHN C. CLUNE (*pro hac vice* motion forthcoming)
KIMBERLY M. HULT (*pro hac vice* motion forthcoming)
CHRISTOPHER W. FORD (*pro hac vice* motion forthcoming)
**HUTCHINSON BLACK AND COOK, LLC**
921 Walnut Street, Suite 200
Boulder, CO 80302
Telephone:    (303) 442-6514
Facsimile:    (303) 442-6593
Emails:       clune@hbcboulder.com, hult@hbcboulder.com, ford@hbcboulder.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>STANFORD UNIVERSITY,<br><br>　　　　Defendant. | Civil Action No.:<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

Plaintiff Jane Doe, by and through her attorneys, The Liu Law Firm, P.C., Equal Rights Advocates, and Hutchinson Black and Cook, LLC, alleges as follows:

## INTRODUCTION

1. Plaintiff "Jane Doe" ("Ms. Doe") brings this action against Defendant Stanford University ("Stanford") because of Stanford's failures to protect her and other female undergraduate students from a male student who was a known sexual predator on campus.[1]

2. Between 2011 and 2014, Stanford received multiple reports that a Stanford student ("Mr. X") had engaged in numerous completed and attempted sexual assaults and dating violence against several female Stanford undergraduates.

3. Along with other reports of Mr. X's misconduct, Stanford was on notice that in February 2011, Mr. X had entered the dorm room of another undergraduate, "Student A", choked Ms. A until she began to lose consciousness, and then raped her.

4. Nonetheless, Stanford effectively ignored those reports. Despite Ms. A having reported that Mr. X had violently attacked and sexually assaulted her, Stanford officials did not investigate her allegations and instead had a Residence Dean simply talk with Mr. X to tell him that physical and sexual assault were "not okay." Afterward, Stanford officials advised Ms. A that although Mr. X did not deny sexually assaulting her, they believed that the conversation with the Residence Dean sufficiently addressed the problem. The Stanford officials implied that they believed Mr. X was unlikely to harm any other young women. The school instead issued a mutual no-contact directive. Predictably, Stanford was mistaken.

5. As a direct result of Stanford's clearly unreasonable failures to take remedial measures to address Mr. X's serious misconduct, Mr. X proceeded to sexually and/or physically assault several female Stanford undergraduate students while he was enrolled at Stanford.

6. Ms. Doe became one of Mr. X's victims when, in February 2014, he physically and sexually assaulted her when she refused his demands that she perform sexual acts.

---

[1] Ms. Doe, a current Stanford student, has filed this Complaint using a pseudonym. Ms. Doe is filing a motion seeking the Court's leave to continue using the pseudonym in this proceeding.

1

7. In June 2014, with sexual assault complaints by at least two women pending against him, Stanford permitted Mr. X to finish his classes and walk at graduation. The next month, Stanford found Mr. X responsible for several charges of serious sexual misconduct, banned him from campus for ten years, and issued additional no-contact directives. Despite its findings, Stanford still promptly awarded Mr. X both his bachelor's and master's degrees.

8. After notifying the impacted women that Mr. X would be banned from campus, Stanford then failed to implement or enforce the campus ban even after it learned that Mr. X had violated at least one of the no-contact directives. In February 2016, Ms. Doe ran into Mr. X on the Stanford campus, dining with another young female Stanford student, in violation of the campus ban. Alarmed and traumatized, Ms. Doe sought assistance from Stanford public safety officers. The officers told her that there was no official record of the ban and they could neither arrest Mr. X nor remove him from campus.

9. As set forth in more detail below, Stanford long had actual, repeated notice of the dangers posed by, and sexual misconduct of, Mr. X, and that Mr. X's conduct created a sexually hostile educational environment for multiple women on campus. By acting with deliberate indifference to that notice, Stanford subjected the women to sexual violence and deprived those women, including Ms. Doe, of equal access to educational opportunities in violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), and the California Education Code § 66270, a provision of California's Equity in Higher Education Act ("Section 66270"), and subjected them to a hostile educational environment on campus. It also violated both California's Gender Motivated Violence Act, California Civil Code § 52.4, and its duties of care to Ms. Doe, causing her to suffer significant emotional distress and other physical and emotional injuries.

**PARTIES, JURISDICTION AND VENUE**

10. Plaintiff Jane Doe is an adult woman who resides in San Mateo County, California. Beginning in September 2011, Ms. Doe has attended Stanford, first as an undergraduate student, and now as a graduate student.

11. Defendant Stanford University ("Stanford") is a private university located in Stanford, California. Stanford receives federal and state funding and is subject to Title IX and Section 66270.

12. This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

13. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL ALLEGATIONS
### Stanford's Actual Notice of, and Deliberate Indifference to, Reports of Mr. X's Dating Violence, Sexual Harassment, and Sexual Assault of Student A

14. In September 2010, during her first week as a Stanford freshman, Student A met Mr. X. Within a few weeks, Mr. X sexually assaulted Ms. A despite her pleading for him to stop.

15. Mr. X's physical and sexual violence toward Ms. A continued and escalated over the following months. By early January 2011, Mr. X, who was approximately 6'6" and weighed well over 200 pounds, had physically assaulted Ms. A, who was approximately 4'11" and 100 pounds, in a dormitory hallway, by knocking her down, dragging her, and kicking her. He had also behaved aggressively toward Ms. A in public.

16. By early February 2011, Ms. A felt increasingly distressed by her inability to end her physically and sexually abusive dating relationship with Mr. X. Finally, Ms. A texted Mr. X on the morning of February 4, 2011, to end their relationship.

17. Later that same day, after Ms. A returned to her dormitory room, Mr. X came to her room and began to verbally assault her. Mr. X then pushed Ms. A onto her bed and began strangling her nearly to the point of unconsciousness, preventing her from screaming, breathing, or moving. Mr. X whispered into her ear, "no one will notice when you die," before raping her.

18. In late February 2011, Ms. A met with a Stanford Counseling and Psychological Services counselor, to whom she shortly thereafter disclosed her relationship abuse and dating violence by Mr. X. In response, the Stanford counselor noted that Ms. A was wearing a sweater that exposed part of one shoulder and asked her to consider whether she placed herself in

potentially risky situations because she wanted to appear sexually available.

19. In March 2011, Ms. A again disclosed the severe dating abuse to her Stanford Academic Director and at least one other Stanford official, although she declined to specifically name Mr. X. At the meeting, Ms. A emphasized her ongoing, deep-seated fear, disclosing that her abuser lived in same residence. In response, one of the officials described the difficulty of proceeding with criminal or administrative action, and her Academic Advisor suggested that Ms. A take individual steps to deal with her rape and improve her mental health, such as renting a car and going to a beach.

20. After the Stanford counselor's victim-blaming response and the Stanford Academic Director's description of the difficulty of taking criminal or administrative action, Ms. A was convinced that Stanford would not support her if she pursued any disciplinary action against Mr. X.

21. By the following fall, Ms. A became concerned that Mr. X might be physically and sexually abusing other young women.

22. Ms. A's concern was well-founded. Upon information and belief, between 2010 and 2014, Mr. X physically and/or sexually assaulted at least four female Stanford students, in addition to other serious misconduct on campus.

**Ms. A Reports Mr. X's Sexual Violence to Stanford**

23. In January 2012, Ms. A met a few times with a Stanford Residence Dean to report Mr. X's violent sexual assault on February 4, 2011. Ms. A emphasized that she wanted to ensure that Mr. X would not sexually or physically abuse any other young women on Stanford's campus.

24. The Residence Dean again gave Ms. A the impression that pursuing her report would be difficult and would provide only negligible benefits or protections. The Residence Dean convinced Ms. A that a mutual no-contact directive usually sufficed to protect sexual assault and dating violence victims.

25. In late January 2012, after a second meeting with Ms. A, the Stanford Residence Dean further advised Ms. A that she had met with Mr. X in person. The Residence Dean told Ms.

A that Mr. X did not contest Ms. A's account of the violent rape, that the Resident Dean had told Stanford's "team of Residence Deans" about Mr. X, and that another Residence Dean would talk with Mr. X about the potential consequences of committing sexual assaults.  In an email on January 23, 2012, Ms. A's Residence Dean said that the second Residence Dean would also tell Mr. X that "the assault[s] (physical and sexual) were not okay and that he has a very serious problem with anger."

26. Her Residence Dean further emphasized to Ms. A that Mr. X was chastened and gave Ms. A the impression that Mr. X was likely to rehabilitate and not harm others.  Ms. A nonetheless sought assurances from the Residence Dean that if any other sexual assault claims were reported against Mr. X, Stanford officials would notify her so that she could pursue disciplinary charges against Mr. X.  The Residence Dean left Ms. A feeling assured that she would be notified.

27. Ms. A agreed to accept the recommended mutual no-contact directive on both Mr. X and Ms. A.

28. More than two years later, on March 5, 2014, Ms. A attended a meeting with Sallie Kim, who was Stanford's Interim Title IX Coordinator, to discuss a campus service group. During the discussion, the group talked about sexual harassment at Stanford, and Ms. A again disclosed her sexual assaults by Mr. X.  On March 11, 2014, Ms. Kim wrote Ms. A, notifying her that she or another Stanford investigator would now investigate the "sexual assault that [Ms. A] had reported more than two years ago."

29. Stanford apparently still did not conduct an investigation of Mr. X's brutal physical and sexual assaults of Ms. A, however.

30. In September 2014, after Ms. A returned to Stanford to begin her graduate studies, Mr. X, now a Stanford graduate, called Ms. A on her cell phone and later texted her in violation of the ongoing no-contact directives.

31. That same fall, Ms. A finally learned about the other complaints against Mr. X.  In a conversation with a Stanford undergraduate in a class she was teaching, "Student B," Ms. A

5
COMPLAINT FOR DAMAGES

discovered that they had both been assaulted by Mr. X while students at Stanford. Ms. B further informed Ms. A that Stanford had found Mr. X responsible for sexual misconduct involving Ms. B and Ms. Doe, and that the no-contact directives issued protected Ms. A as well as Ms. B and Ms. Doe. Stanford, however, issued its findings only after Mr. X had graduated.

32. Horrified, on October 17, 2014, Ms. A emailed Dean Glaze, reporting that Mr. X had begun contacting her again and specifically requesting that Stanford conduct an investigation into her report that Mr. X had physically and sexually assaulted her in February 2011.

33. On December 15, 2014, Stanford's then Title IX Coordinator, Catherine Criswell, sent Ms. A a letter notifying her that Stanford had found that Mr. X had physically assaulted her in February 2011 and violated the no-contact directive by calling and texting her during the fall of 2014. The letter explained that, because Mr. X was no longer a student, only administrative remedies had been imposed on Mr. X, including a no-contact order and a 15-year ban from campus.

34. Notably, however, the letter failed even to mention Mr. X's rape of Ms. A, which was only included later upon Ms. A's specific request.

35. Given Stanford's failures to respond to her reports of sexual violence and Mr. X's continued attempts to contact her, in January 2015, Ms. A took a leave of absence. She formally withdrew from her graduate program in the fall of 2016. She has not resumed her studies.

**Due to Stanford's Failure to Respond to Ms. A's Reports of Rape by Mr. X, Mr. X Physically and Sexually Assaults Ms. Doe**

36. Unaware of Mr. X's considerable history of sexual harassment, dating violence, and sexual assault, Ms. Doe began casually dating Mr. X in or around November 2013. Mr. X was a senior, and Ms. Doe was a junior.

37. Ms. Doe ended her dating relationship with Mr. X in January 2014, although they remained friendly.

38. On February 27, 2014, when Ms. Doe returned home late after working on a group project, she found Mr. X at her residence hall attending a weekly happy hour.

39. Mr. X approached Ms. Doe and began pestering her to spend time with him at his residence. She eventually agreed to go to his residence. Mr. X then demanded oral sex from Ms. Doe. When she refused, Mr. X began threatening her and told her that because she was in his room, listening to his music, and drinking his alcohol, she was obligated to provide him with what he wanted.

40. When Ms. Doe continued to refuse to perform oral sex on Mr. X, he forcefully flipped her over onto her stomach and sexually assaulted her, attempting to penetrate her vaginally. A few seconds later, Mr. X released her, but he then began insulting Ms. Doe, swearing at her, calling her a "slut," and telling her that she owed him. He also repeatedly told her to go "kill [her]self."

41. As Ms. Doe prepared to leave, Mr. X repeated his demand for oral sex. When Ms. Doe refused, Mr. X again turned violent, pushing her face forcefully. When Ms. Doe began to fight back, he grabbed her left hand and began wringing her wrist with both of his hands. He pulled her entire arm and pinned it behind her back, straining and injuring her shoulder. Although Ms. Doe told him to stop, Mr. X did not let go for several seconds. When he finally let go, Mr. X pushed Ms. Doe away.

42. Before Ms. Doe left, Mr. X again told her to go kill herself.

43. The next day, on February 28, 2014, Ms. Doe learned that her residence had been vandalized the previous night. Other students in her building told her that they suspected that Mr. X had caused the damage and reported him to a Residence Dean.

44. Mr. X continued to contact Ms. Doe. He texted her on March 3, 2014, to tell her that he wanted to apologize for "how drunk" he was on the night of the assault. He also told her that the Residence Dean had relayed her "concerns" about his behavior, apparently believing that Ms. Doe had already reported the physical and sexual assaults, although she had not. In the text communications, Mr. X said he didn't have "specific details" but felt "terrible that [he] made [her] feel unsafe in any[]way." He promised to delete her number, as Ms. Doe requested, and not to return to her residence that week.

45. On March 4, 2014, Mr. X again reached out to Ms. Doe, informing her that he had been banned from her residence following his destruction of school property and that he had been ordered to undergo alcohol counseling.

46. In the following days, Ms. Doe told several friends about the assaults. She quickly learned from mutual friends and acquaintances that Mr. X had physically and sexually assaulted other female students at Stanford, including Ms. B.

47. Approximately one month later, in April 2014, Ms. Doe saw Mr. X having dinner with a female freshman she had recently met. Already fearful for her own safety, and now aware of Mr. X's pattern of sexual violence against other young women, Ms. Doe became concerned for the younger student's safety and decided to take formal action.

48. On April 11, 2014, Ms. Doe emailed her Stanford Residence Dean to report the assault by Mr. X. On April 12, 2014, Ms. Doe met with her Residence Dean and another Stanford Residence Dean to file a report and discuss her options for proceeding against Mr. X.

49. A few days later, Ms. Doe asked Stanford officials if any other women had reported sexual or physical assaults by Mr. X. Stanford officials declined to provide her with information, other than to say that Ms. Doe would probably be the only complainant against Mr. X.

50. On April 22 and 23, 2014, Ms. Doe also provided Residential Education Assistant Dean Danielle Masuda and Sallie Kim, the Interim Title IX Coordinator, with the names of the four additional women whom she had heard had also been sexually and/or physically assaulted by Mr. X.

51. On April 23, 2014, Dean Masuda and Ms. Kim informed Ms. Doe that Dean Glaze would be investigating Ms. Doe's complaint against Mr. X and that Mr. X did not deny Ms. Doe's allegations.

52. During that meeting, Dean Masuda and Ms. Kim also informed Ms. Doe that Mr. X had initiated a complaint against Ms. Doe, claiming that she had tried to "coerce" him sexually on February 6, 2014. Mr. X's claim was obviously retaliatory (and Stanford later found it was not

credible).

53. On April 24, 2014, Ms. Kim sent Ms. Doe a Notice of Investigation and imposed a no-contact directive on Ms. Doe.

54. When Ms. Kim launched this investigation of Ms. Doe, she knew that Ms. A had also reported being violently raped by Mr. X. Neither Ms. Kim nor anyone else informed Ms. Doe that at least one other woman (Ms. A) had previously reported a violent sexual and physical assault by Mr. X.

55. Over the next several weeks, the emotional toll of Mr. X's sexual assault and the investigation, including the false, retaliatory report of sexual misconduct against her triggered a severe response and caused Ms. Doe to miss many classes and to fall behind in her schoolwork.

56. After not hearing from the Stanford officials for almost a month, Ms. Doe contacted Stanford officials on May 21, 2014, to request an update on the investigation.

57. The following day, Ms. Doe met with Dean Cathy Glaze and Stanford's outside Title IX investigator, Mark Zurich. At the meeting, Dean Glaze and Mr. Zurich told Ms. Doe that Mr. X now denied her account and that they saw her situation as a "he said, she said" situation. They told Ms. Doe that they believed that Mr. X's actions toward her did not qualify as prohibited sexual behavior or a sexual assault.

58. When Ms. Doe inquired about Mr. X's pattern and history of sexual assaults and dating violence, Dean Glaze and Mr. Zurich told her only that the other women had declined to come forward. Neither Dean Glaze nor Mr. Zurich advised Ms. Doe of Ms. A's prior reports to Stanford officials of her sexual and physical assaults by Mr. X.

59. Ms. Doe was deeply upset and disappointed by the meeting with Dean Glaze and Mr. Zurich, particularly their suggestion that Mr. X had done nothing wrong, and the fact that there would be no investigation into Mr. X.

60. In June 2014, Ms. B formally reported that Mr. X had physically assaulted her when she refused to engage in sexual intercourse with him. According to Ms. B, Mr. X became violently angry at her refusal, threw a table at her and punched her in the face while holding a

shampoo bottle, splitting her lip. After the assault, Ms. B took a leave of absence from Stanford.

61. After Ms. B's report, on June 9, 2014, Stanford notified Ms. Doe that, given Ms. B's report, it would now review both Ms. B's report and Ms. Doe's report together. Stanford informed her that the two reports together now suggested a pattern of sexual misconduct by Mr. X. Even then, Stanford failed to disclose to Ms. Doe the prior reports that Mr. X had physically and sexually assaulted Ms. A.

62. On June 15, 2014, Stanford permitted Mr. X to walk in his graduation ceremonies. A hold was placed on his degrees pending the resolution of Ms. Doe's and Ms. B's complaints against him.

63. That summer, Ms. Doe studied overseas and requested that Stanford delay any proceedings so that she could participate fully in them. In response, Stanford officials advised Ms. Doe and Ms. B that Stanford wanted to resolve the complaints informally before Ms. Doe returned because Mr. X might lose his job if he did not promptly receive his degrees. Pressured by Stanford officials, in July 2014, Ms. Doe and Ms. B consented to Stanford's proposed informal resolution, which Stanford advised them would provide the same kinds of remedies as the formal disciplinary process.

64. On July 11, 2014, Stanford sent Ms. Doe a Final Outcome Letter explaining its investigation findings and the resolution terms. Stanford found that Mr. X engaged in an attempted sexual assault with duress of Ms. Doe. With respect to both Ms. B and Ms. Doe, Stanford officials also found that Mr. X had engaged in a pattern of violent behavior when women refused his demands for sexual acts, thereby violating Title IX policy on relationship violence, as well as Title IX and University policy on sexual harassment. Stanford imposed various administrative remedies on Mr. X, including a no-contact directive and a 10-year ban from campus.

65. Despite the findings, Stanford awarded Mr. X his two degrees: a bachelor's degree in economics and a master's degree in management science and engineering.

66. On July 11, 2014, the same day that Stanford issued its Final Outcome Letter, Stanford also sent a letter to Ms. Doe at her parents' address, placing her on academic probation despite her requests for academic accommodations in May 2014. This letter forced Ms. Doe to disclose to her parents the sexual and physical violence by Mr. X, triggering additional anxiety about her academic career and the assault and preventing her from focusing on her research and studies.

67. On February 11, 2016, Mr. X visited the Stanford campus in violation of his campus ban. During his visit, Ms. Doe ran into Mr. X, who was dining at an on-campus restaurant, The Axe and Palm, with a female Stanford student.

68. Panicked, Ms. Doe immediately reported Mr. X to Stanford's Department of Public Safety, since Stanford had told her that he would be subject to arrest if he violated the campus ban.

69. In response, Stanford's Department of Public Safety told Ms. Doe that they did not have authority to remove Mr. X from campus because they had no record of a campus ban. Stanford's Department of Public Safety also requested that Ms. Doe go online to locate photographs of Mr. X so that they could identify him. When the Department of Public Safety was presented with a copy of Ms. Doe's Final Outcome Letter, the officer told her and others that they still could not act because they did not have anything "official" and because campus bans were a "gray area."

70. After the Department of Public Safety said that they could not enforce the ban, Ms. Doe no longer felt safe on campus, stopped attending her courses, and failed to complete her winter quarter classes. She needed to take a leave of absence for the spring 2016 quarter.

71. While Mr. X graduated from Stanford with two degrees in hand to embark on his professional career, Ms. Doe's academic career has been derailed as she continues to struggle with the lasting psychological, emotional, and academic repercussions of Mr. X's assault of her at Stanford.

**First Claim for Relief**

**Violation of Title IX (20 U.S.C. § 1681(a))**

72. Plaintiff incorporates by reference all preceding paragraphs into this Claim as though fully stated herein.

73. Stanford, through the inaction of various officials with the ability and authority to take remedial action to stop the sexual harassment, sexual assaults, and sexual discrimination, had actual knowledge of, and was deliberately indifferent to sexual harassment that was so severe, pervasive and objectively offensive that it deprived Ms. Doe of access to the educational benefits or opportunities provided by Stanford, in violation of Title IX.

74. Beginning as early as January 2011, Stanford had actual notice of, and was deliberately indifferent to, reports and/or a substantial risk of severe and pervasive sexual harassment and dating violence presented by Mr. X to female students at Stanford.

75. By January 2012, Stanford received additional notice of, and was deliberately indifferent to, reports and/or notice that Mr. X had violently sexually assaulted Ms. A in February 2011.

76. As a direct and proximate result of Stanford's deliberate indifference to actual knowledge of and notice of a substantial risk of further sexual harassment, dating violence, and sexual assault, Ms. Doe was subjected to a violent physical attack and attempted sexual assault by Mr. X on February 27, 2014.

77. As a direct and proximate result of Stanford's ongoing deliberate indifference to its actual notice of the February 27, 2014 attempted sexual assault and attack by Mr. X on Ms. Doe, Ms. Doe was subjected to a continuing hostile environment on the Stanford campus.

78. Stanford's failure to take any action to prevent or redress reports of Mr. X's violent conduct toward female students or to address the severe and pervasive sexual harassment, despite its authority to do so, was clearly unreasonable in light of known circumstances.

79. As a result of Stanford's misconduct, Ms. Doe suffered significant, severe, and ongoing emotional distress and mental anguish.

80. Ms. Doe was subjected to physical sexual harassment, sexual assaults, and sexual discrimination that were so severe, pervasive, and objectively offensive that she was denied access to educational opportunities and benefits.

81. As a result of the sexual assaults and resulting distress, Ms. Doe's studies and education suffered substantially, she was unable to complete her classes, and she took a leave of absence.

82. In addition, Ms. Doe has suffered and continues to suffer from considerable anxiety and emotional distress regarding her experience, safety, and well-being, and has suffered both economic and non-economic damages as a result of Stanford's violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as set forth above.

## Second Claim for Relief

## Violations of the California Equity in Higher Education Act

83. Plaintiff incorporates by reference all preceding paragraphs into this Claim as though fully stated herein.

84. Stanford is a postsecondary educational institution that receives, or benefits from, state financial assistance and enrolls students who receive state student financial aid.

85. Ms. Doe was subjected to discrimination on the basis of gender while attending Stanford, as set forth in the preceding paragraphs.

86. Stanford's actions and inaction as alleged herein violated the Equity in Higher Education Act, Cal. Ed. Code § 66270, which is enforceable through a civil action pursuant to Cal. Ed. Code § 66292.4.

87. As a direct and proximate result of the gender discrimination to which she was subjected, Ms. Doe was denied equal rights and opportunities at Stanford, and suffered economic damages and emotional harm.

## Third Claim for Relief

## California Civil Code § 52.4

88. Plaintiff incorporates by reference all preceding paragraphs into this Claim as

though fully stated herein.

89. Under California Civil Code section 52.4, any person who has been subjected to gender violence may bring an action for damages against any responsible party.

90. Plaintiff was subjected to gender violence as defined by California Civil Code section 52.4(c), as described herein.

91. Defendant was a responsible party with respect to the gender violence to which Plaintiff was subjected, for the reasons set forth herein.

92. As a result of Stanford's violations, Plaintiff suffered economic and non-economic damages as previously set forth herein.

### Fourth Claim for Relief

### Negligence

93. Plaintiff incorporates by reference all preceding paragraphs into this Claim as though fully stated herein.

94. Stanford owed a duty of reasonable care to Ms. Doe in its actions and conduct toward her. It was foreseeable and probable that Ms. Doe would suffer serious emotional distress as a result of Stanford's conduct described above.

95. Stanford was negligent by breaching the duty of care it owed Ms. Doe, as set forth herein.

96. Stanford's negligent actions were a proximate cause of Mr. X's sexual and physical assaults of Ms. Doe.

97. Ms. Doe has suffered serious emotional distress as well as physical injury as a direct and proximate result of Stanford's negligent actions towards her.

98. Stanford's negligent actions were a substantial factor in causing Ms. Doe's serious emotional distress and her other damages.

99. As a direct and proximate result of Stanford's negligent actions, Ms. Doe has suffered past and future special damages and past and future general damages in an amount to be proven at trial. Ms. Doe has been damaged and injured physically, emotionally, and financially,

including but not limited to suffering from pain, anxiety, depression, serious emotional distress, and embarrassment, as well as loss of health, future relationships, income, employment, and future career benefits and earning potential.

### PRAYER FOR RELIEF

On her claims for relief, Plaintiff Jane Doe seeks the following:

A.  An award of damages to be determined at trial, including, without limitation, reimbursement and prepayment for all of her expenses incurred as a consequence of the assault, Stanford's deliberate indifference, and Stanford's negligence; damages for deprivation of equal access to the educational benefits and opportunities provided by Stanford; other past and future economic damages; past and future special damages and past and future general damages for Stanford's negligent actions; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present, and future enjoyment of life in an amount to be determined by the jury;

B.  Statutory and mandatory interest on all sums awarded, including but not limited to pre- and post-judgment interest;

C.  An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988(b), Cal. Civil Code § 52.4(a), Cal. Civ. Code § 1021.5, and any other applicable provision of law; and

D.  Any other relief as is proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to a jury trial.

DATED: December 5, 2016

Respectfully submitted,

**THE LIU LAW FIRM, P.C.**

By: */s/ Jennifer L. Liu*
    Jennifer L. Liu
    1170 Market Street, Suite 700
    San Francisco, California 94102
    Telephone: (415) 896-4260
    Facsimile: (415) 231-0011
    Email: jliu@liulawpc.com

JENNIFER A. REISCH – 223671
REBECCA PETERSON-FISHER – 255359
**EQUAL RIGHTS ADVOCATES**
1170 Market Street, Suite 700
San Francisco, CA 94102
Telephone: (415) 621-0672
Facsimile: (415) 631-6744
Emails: jreisch@equalrights.org,
rpetersonfisher@equalrights.org

JOHN C. CLUNE (*pro hac vice* motion forthcoming)
KIMBERLY M. HULT (*pro hac vice* motion forthcoming)
CHRISTOPHER W. FORD (*pro hac vice* motion forthcoming)
**HUTCHINSON BLACK AND COOK, LLC**
921 Walnut Street, Suite 200
Boulder, CO 80302
Telephone: (303) 442-6514
Facsimile: (303) 442-6593
Emails: clune@hbcboulder.com,
hult@hbcboulder.com, ford@hbcboulder.com